**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**MAKEL BARNES**, *et al.*,

    *Plaintiffs,*

**v.**

                               **Case No. 1:24-cv-750-RCL**

**DISTRICT OF COLUMBIA**, *et al.*,

    *Defendants.*

## MEMORANDUM OPINION

Plaintiffs are two lifetime residents of the District of Columbia (the "District" or "D.C.") who are currently incarcerated in facilities run by the Federal Bureau of Prisons ("BOP"). They are in BOP facilities because they were each convicted of felony violations of the D.C. Code, and a federal statute requires that such offenders ("D.C. Offenders") be committed to BOP correctional facilities rather than to D.C. correctional facilities. Immediately prior to their incarceration, the plaintiffs were high school students enrolled in special-education programs in the District of Columbia Public Schools ("DCPS"), where they received special education and other related services pursuant to the Individuals with Disabilities Act ("IDEA").

Since the beginning of their incarceration in BOP facilities, the plaintiffs have been denied the special education services they were receiving from DCPS in accordance with the IDEA. They have sued both the District and BOP, alleging that the District has violated the IDEA by denying them a free appropriate public education ("FAPE"). Because BOP, as a federal agency, is not bound by the IDEA, the plaintiffs' suit against the BOP alleges constitutional rather than statutory claims: They contend that the agency violated their due process rights by denying them access to a FAPE without notice or a meaningful opportunity to be heard.

Both the BOP [ECF No. 30] and the District [ECF No. 31] have filed Motions to Dismiss the plaintiffs' claims on various grounds. Additionally, the plaintiffs have filed a Motion [ECF No. 22] to Certify Class.

For the reasons herein, the Court will **GRANT IN PART AND DENY IN PART** the defendants Motions to Dismiss. The Court will also **GRANT IN PART AND DENY IN PART** the plaintiffs' Motion to Certify the Class, finding that a narrower class than the one proposed by the plaintiffs is appropriate, taking into consideration the subset of their claims that will proceed beyond the Motions to Dismiss.

## I.    BACKGROUND

### A.    STATUTORY BACKGROUND

There are two statutes at issue in this litigation, which together create a catch-22 for the District. First, the IDEA was originally passed by Congress in 1975[1] to support the education of students with disabilities. 20 U.S.C. § 1400 *et seq.* The IDEA was passed "to ensure that all children with disabilities have available to them a free appropriate public education . . . ." *Id.* § 1400(d)(1)(A). Under the IDEA, states (and the District of Columbia) must make a FAPE available to all children residing in the state with a disability through their twenty-first birthday. *Id.* § 1412(a). District regulations extend eligibility for District residents through the end of the school year in which the child turns twenty-two. D.C. Mun. Regs. tit. 5-A, § 3001.4 (2022).

To effectuate its goals, the IDEA assigns responsibilities to agencies at all levels of state government. At the most local level, local educational agencies ("LEA") must develop Individualized Education Programs ("IEP") for each eligible student to meet their particular learning needs. 20 U.S.C. § 1414(d)(2)(A). An IEP is a "written statement for each child with a

---

[1] The IDEA was originally known as the All Handicapped Children Act.

disability that is developed, reviewed, and revised in accordance with" the IDEA. *Id.* § 1414(d)(1)(A)(i). LEAs are supported in their work by state education agencies ("SEA"), which must intervene whenever they determine that a local educational agency "is unable to establish and maintain programs of free appropriate public education" as defined by the IDEA. *Id.* § 1413(g)(1)(B). Subsequent federal regulations have made clear that "[s]tate and local juvenile and adult correctional facilities" are also subject to the provisions of the IDEA. 34 C.F.R. § 300.2(b)(1)(i), (ii), (iv).

The District has implemented a set of municipal regulations to comply with the IDEA. D.C. Mun. Regs. tit. 5-A, § 3001, *et seq.* (2022). The regulations span over 100 pages and cover everything from implementation of IEP teams to establishing a structure of compliance between the LEA and SEA. Relevant here, DCPS has been appointed as the LEA overseeing the plaintiffs' special education. *Id.* § 3099.1. As the LEA for the District, DCPS bears the "responsibility to make a FAPE available . . . to all children with disabilities between the ages of three (3) and twenty-two (22) years old[] who are residents of the District of Columbia." *Id.* § 3001.2. The District's SEA is the Office of the State Superintendent of Education ("OSSE"). *Id.* § 3099.1. OSSE is responsible for monitoring DCPS and "ensur[ing] that . . . noncompliance is corrected as soon as possible, and in no case later than one year after the State's identification of the noncompliance." 34 C.F.R. 300.600(e).

Under the IDEA, state agencies must "maintain procedures" designed to "ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education." 20 U.S.C. § 1415(a). Under the IDEA's procedures, an individual with a complaint regarding inadequate provision of a FAPE by the LEA "shall have an opportunity for an impartial due process hearing," which is conducted by either the

LEA or the SEA, as determined by state law. 20 U.S.C. § 1415(f)(1)(A). The hearing must take place before a hearing officer, who "shall . . . not be" an employee of either the LEA or SEA. *Id.* § 1415(f)(3)(A)(i). The hearing provides substantial procedural safeguards, affording claimants an opportunity to "be accompanied by counsel and to confront, cross-examine, and compel the attendance of witnesses." *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988). These safeguards are balanced by a limitations period that allows claims only for deprivations of a FAPE "that occurred not more than two years before the date [the claimant knew] or should have known" about the deprivation. 20 U.S.C. § 1415(b)(6)(B).

At the conclusion of the hearing—often called an administrative hearing or due process hearing—the hearing officer makes a determination (the "Hearing Officer Determination" or "HOD"), which "shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education." *Id.* § 1415(f)(3)(E)(i). If the hearing officer determines that a child has been denied a FAPE, the officer has "broad discretion to fashion an appropriate remedy." *B.D. v. District of Columbia*, 817 F.3d 792, 798 (D.C. Cir. 2016). Any party "aggrieved by" the HOD "may appeal such findings and decision." 20 U.S.C. § 1415(g)(1). If the hearing is held by the LEA, the appeal must first to go the SEA. *Id.* § 1415(g)(2). If the individual is aggrieved by the decision of the SEA, they may bring a civil action "in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy." *Id.* § 1415(i)(2)(A).

Second, the National Capital Revitalization and Self-Government Improvement Act of 1997 (the "Revitalization Act") commits all defendants convicted of a felony violation of the D.C. code to the custody of the BOP. Pub. L. No. 105-33, § 11201(b), 111 Stat. 712 (1997) (codified at D.C. Code § 24-101); D.C. Code § 24-101(b); *Chase v. Public Def. Serv.*, 956 A.2d 67, 72

(D.C. 2008) ("When it enacted the Revitalization Act in 1997, Congress shifted control over several criminal justice functions from the District of Columbia to the federal government.").

### B.    FACTUAL BACKGROUND

Given that this case is before the Court at the motion to dismiss stage, the factual background is mainly drawn from the plaintiffs' Complaint. The plaintiffs are two individuals who were convicted of felony violations of the D.C. Criminal Code and sentenced in D.C. Superior Court. First Am. Compl. ¶ 6, ECF No. 5 ("Compl."). Pursuant to the Revitalization Act, they were committed to the custody of the BOP to be placed in facilities throughout the country.

Plaintiff Makel Barnes was sentenced on August 23, 2021, and committed to BOP custody in September 2021, when he was around nineteen years old. Compl. ¶ 52. Prior to his incarceration, Mr. Barnes was a student within the DCPS system, where he was evaluated and classified as a student with an "Other Health Impairment." Compl. ¶ 45. According to District regulations, this determination is made for students who have "limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment." D.C. Mun. Regs. tit. 5-A, § 3011.10(a). He received his most recent special education evaluation on March 25, 2021, and his most recent eligibility determination was made in April of that same year. Compl. ¶¶ 46–47. At the eligibility determination, Mr. Barnes received an IEP, which called for fifteen hours per week of specialized instruction and 120 minutes per week of behavioral support and transition services. Id. ¶ 50. After his sentencing by the D.C. Superior Court, Mr. Barnes was incarcerated at Federal Correctional Institute ("FCI") Cumberland, but he has since been transferred to United States Penitentiary ("USP") Cannan. Id. ¶ 53. Neither FCI Cumberland nor USP Cannan offers a credit-bearing high

school diploma program, nor do they provide special education services pursuant to the IDEA. *Id.* ¶ 54–55.

Plaintiff Darius McNeal was sentenced on December 14, 2018, and committed to BOP custody in January 2019, when he was around eighteen years old. *Id.* ¶ 78. Prior to his incarceration, Mr. McNeal was a student within the DCPS system, where he was evaluated and classified as a student with a "Specific Learning Disability" and "Other Health Impairment." *Id.* ¶ 71. A student with a specific learning disability is deemed to have a "disorder" in "one (1) or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may affect the ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia." D.C. Mun. Regs. tit. 5-A, § 3011.11(a). Mr. McNeal received his most recent special education evaluation in October 2018. Compl. ¶ 72. He received his most recent eligibility determination on December 5, 2018, just nine days before he was sentenced in D.C. Superior Court. *Id.* ¶ 75. He was deemed eligible for twenty hours per week of specialized instruction and thirty minutes per week of behavioral support services. *Id.* ¶ 76. After sentencing, he was initially housed at FCI Gilmore, and he is currently housed at FCI Pollock. *Id.* ¶ 79.

On February 21, 2023, the plaintiffs filed administrative due process complaints pursuant to the IDEA individually and on behalf of all similarly situated students. *Id.* ¶ 12.[2] Although the plaintiffs filed separate complaints, the substance of their complaints was the same, and they were represented by the same lawyers. The gravamen of the complaints was that DCPS was denying them a FAPE by (1) not ensuring implementation of special education services during their period

---

[2] As discussed *infra*, the hearing officer did not have the authority to rule on the claims of the alleged class.

of incarceration at BOP and (2) failing to hold annual IEP meetings with written notice so the student's IEP team could develop an effective IEP; and that OSSE was denying them a FAPE by failing to ensure DCPS, as the LEA, had provided special education services during their period of incarceration.  Hearing Officer Determination, Compl. Ex. A at 11, ECF No. 5-1 ("Barnes HOD"); Hearing Officer Determination, Compl. Ex. B at 11, ECF No. 5-2 ("McNeil HOD").

As relief for these denials, Plaintiff Barnes requested one year of extended eligibility from the date on which he was able to enroll in a high school diploma program.  He also requested compensatory services for those services he lost, specifically asking for 100–125 hours of services to target reading, writing, and math; 25–30 hours of transition services; and 12–15 hours of services focused on social, emotional, and behavioral development.  Plaintiff McNeal also sought extended eligibility, but, given that he was incarcerated at an earlier age, he sought two years of extended eligibility; 450 hours of compensatory education targeting reading, writing, and math; fifteen to sixty hours of transition services; and fifty-five hours of social, emotional, and behavioral development services.  Both plaintiffs also requested declarations from the hearing officer that the District had denied them a FAPE, a slew of orders intended to bring the District into compliance with the IDEA, and an order directing the District to enter an agreement with BOP to place the students at a D.C. correctional facility throughout the remainder of their (extended) IDEA eligibility.  Barnes HOD 23; McNeal HOD 25.

The hearing officer provided the plaintiffs with most of their requested relief.  His decision was heavily informed by a series of decisions by another court in this District.  Between 2018 and 2019, Judges Moss and Harvey issued a series of four opinions captioned *Brown v. District of Columbia*. *See generally Brown v. District of Columbia*, No. 17-cv-348-GMH, 2018 WL 774902, at *1 (Jan. 24, 2018) ("*Brown I*"); *Brown v. District of Columbia*, 324 F. Supp. 3d 154 (D.D.C.

2018) ("*Brown II*"); *Brown v. District of Columbia*, No. 17-cv-348-RDM, 2019 WL 1924245 (D.D.C. Apr. 30, 2019) ("*Brown III*"); *Brown v. District of Columbia*, No. 17-cv-348-GMH, 2019 WL 3423208, at *1 (D.D.C. Jul. 8, 2019) ("*Brown IV*"). In those decisions, the court held that D.C. Offenders' placement in BOP facilities pursuant to the Revitalization Act did not extinguish the District's obligation to provide them a FAPE under the IDEA. The four decisions stand for the proposition "that the District [is] responsible for providing [D.C. Offenders] a FAPE" during the time they are incarcerated in BOP facilities under the Revitalization Act. *Brown IV*, 2019 WL 3423208, at *1. The court based its decision on a plain reading of the IDEA, which states that it applies to individuals in "adult or juvenile *Federal*, State, or local correctional institutions." *Brown II*, 324 F. Supp. 3d at 161–62 (citing 20 U.S.C. § 1415(m)(1)(D)) (emphasis in original).

Based on the *Brown* decisions, the hearing officer issued HODs in favor of both plaintiffs and against the District on December 15, 2023.[3] In the HODs, he held that even after the passage of the Revitalization Act, the IDEA compels the District to provide all District students with disabilities a FAPE. Barnes HOD 17. He further found that the BOP had categorically refused to work with the District to facilitate access to a FAPE. *Id.* at 8. The BOP refused either to "relocate offenders in its custody to allow them to receive IDEA services" or to "permit outside contractors to access its facilities." *Id.* Recognizing that DCPS had employed various tactics, including deployment of a dispute resolution specialist, to get in touch with BOP, the hearing officer nevertheless declared that the District was liable for failing to provide a FAPE. *Id.* at 17. The hearing officer therefore awarded the plaintiffs the exact amount of compensatory educational services they requested, and he issued a declaration that the District had failed to provide the plaintiffs a FAPE. *Id.* at 23–24. He did not, however, order that their eligibility be extended or

---

[3] Because the HODs for the plaintiffs are virtually identical in their findings of fact and conclusions of law, the Court will mainly cite to the Barnes HOD in the following discussion.

that the District enter an agreement with BOP to transfer the plaintiffs to a D.C. correctional facility, finding he had no authority to do so. *Id.* at 27.

Alleging they were "aggrieved"[4] by the latter two denials of relief, the plaintiffs brought suit in this Court in March 2024. The operative Amended Complaint was filed in April 2024. The plaintiffs purport to represent a class comprised of all District residents between the ages of eighteen (18) and twenty-four (24)[5] who are, were, or will be simultaneously incarcerated in the BOP as D.C. Code Offenders and entitled to receive special education or related services under the IDEA and D.C.'s implementing regulations. Compl. ¶ 28. The plaintiffs filed a Motion for Class Certification in June 2024. Mot. for Class Cert., ECF No. 22. The District and BOP each filed Oppositions to class certification in October 2024. Mem. in Opp'n to Mot. to Certify Class by the District of Columbia ("Dist. Opp'n"), ECF No. 45; Mem. in Opp'n to Mot. to Certify Class by the Bureau of Prisons ("BOP Opp'n"), ECF No. 46. And the plaintiffs filed replies to each of those Opposition motions in November 2024. Plaintiffs' Reply to the Bureau of Prisons in Support of Their Mot. for Class Certification ("Pl.'s Repl. to BOP"), ECF No. 49; Plaintiffs' Reply to the District of Columbia in Support of Their Mot. for Class Certification ("Pl.'s Repl. to Dist."), ECF No. 50.

In August 2024, the District and BOP filed separate motions to dismiss the plaintiffs' claims. District of Columbia Motion to Dismiss, ECF No. 31 ("Dist. Mot. to Dismiss"); BOP Motion to Dismiss, or in the Alternative, for Summary Judgment, ECF No. 30 ("BOP Mot. to Dismiss"). The plaintiffs have filed a reply to each of those motions. Plaintiffs' Mem. in Opposition to the District of Columbia's Mot. to Dismiss, ECF No. 44 ("Pl.'s Opp'n to Dist.");

---

[4] As discussed *supra*, plaintiffs may only bring a complaint in this court under the IDEA if they are "aggrieved" by the HOD. 20 U.S.C. § 1415(g)(1)

[5] The IDEA has a two-year limitations provision, meaning an individual who is twenty-four could still file claims for alleged deprivations that took place while they were still eligible. 20 U.S.C. § 1415(b)(6)(B).

Plaintiffs' Mem. in Opposition to the Bureau of Prison's Mot. to Dismiss, ECF No. 40 ("Pl.'s Opp'n to BOP"). And the District and BOP have filed their reply briefs. Dist. Repl., ECF No. 47; BOP Repl., ECF No. 48. With these eleven briefs now before the Court, the Motion for Class Certification, District Motion to Dismiss, and BOP Motion to Dismiss are all ripe for review.

## II.    LEGAL STANDARDS

### A.    Motion to Dismiss for Failure to State a Claim Under Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a defendant in a civil action may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Courts considering a defendant's motion to dismiss "must accept as true all of the allegations contained in a complaint." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must then determine whether the complaint states "a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 570 (2007)). A complaint that consists of nothing more than "a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555. Rather, a claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### B.    Motion to Dismiss for Lack of Subject Matter Jurisdiction Under Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) invokes a more exacting standard than Rule 12(b)(6) because it addresses a court's jurisdiction to hear a claim in the first place. While a court must "take all the well-pleaded allegations in the complaint as true, and must draw all reasonable inferences in the plaintiff's favor," *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 190 (D.D.C.

2024), a "plaintiff's allegations 'will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim.'" *Id.* (citing *Grand Lodge of the Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001)). Article III, Section 2 of the Constitution is also relevant to a court's consideration of jurisdiction because it limits the federal courts to "cases" and "controversies." "Two interrelated doctrines—standing and mootness—give life to" this limitation on federal court jurisdiction. *Citizens for Responsibility & Ethics in Wash. v. Wheeler*, 352 F. Supp. 3d 1, 8 (D.D.C. 2019).

### 1. Standing

Federal courts are courts of limited jurisdiction, and they must therefore only assert their power to resolve "cases" or "controversies." For a case or controversy to exist under Article III of the Constitution, "the plaintiff must have . . . standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). To establish standing, a plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).

When determining whether an alleged injury is "concrete," Courts "must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." *Id.* at 425. Congress may "elevate" harms that exist in the real world into legal claims, but Courts must still "independently decide whether a plaintiff has suffered a concrete harm." *Id.* at 426.

"To determine whether an injury is redressable, [courts] consider the relationship between the judicial relief requested and the injury suffered." *Murthy v. Missouri*, 603 U.S. 43, 73 (2024)

(quoting *California v. Texas*, 593 U.S. 659, 671 (2021)).  To obtain forward-looking relief in the form of an injunction, "plaintiffs must establish a substantial risk of future injury that is traceable to the Government defendants and likely to be redressed by an injunction against them." *Id.* at 69.

### 2.     Mootness

The doctrine of mootness applies to cases where it has become "impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Loc. 100*, 567 U.S. 298, 307 (2012).  A claim that a case is moot goes directly to the court's jurisdiction, so "mootness must be assessed at 'all stages' of the litigation to ensure a live controversy remains." *Aref v. Lynch*, 833 F.3d 242, 250 (D.C. Cir. 2016).  Once a plaintiff has met its initial burden to demonstrate standing, a defendant seeking dismissal on mootness grounds bears the burden of production.  *Honeywell Int'l, Inc. v. Nuclear Regulatory Comm'n*, 628 F.3d 568, 576 (D.C. Cir. 2010) ("The initial 'heavy burden' of establishing mootness lies with the party asserting a case is moot.").

In class action suits, courts have recognized that some interests may be mooted before certification of the class is possible.  Mootness doctrine, therefore, "has evolved two exceptions which allow a class action to proceed even if the named plaintiff's claims are mooted before certification." *Id.* at 191.  Relevant here is the "inherently transitory" exception, which "applies to claims so fleeting that 'the trial court will not have even enough time to rule' on class certification before the named plaintiff's claim expires." *Id.* (citing *DL v. Dist. of Columbia*, 860 F.3d 713, 721 (D.C. Cir. 2017)).  To determine whether the exception applies, courts must discern: "(i) whether the individual claim might end before the district court has a reasonable amount of time to decide class certification, and (ii) whether some class members will retain a live claim at every stage of litigation." *J.D. v. Azar*, 925 F.3d 1291, 1311 (D.C. Cir. 2019)).

**C.      Motion for Summary Judgment Under Federal Rule of Civil Procedure 56**

Summary judgment is appropriate where a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute exists if "reasonable minds could differ" as to the fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  It is not enough, however, for the non-moving party to show that "there is merely some alleged factual dispute." *DL v. Dist. of Columbia*, 730 F. Supp. 2d 84, 89 (D.D.C. 2010) (citing *Anderson*, 477 U.S. at 255).  Courts will only deny summary judgment if there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 247.  With this understanding in mind, the "Court's role when deciding summary judgment motions is only to determine if there is a genuine dispute of material fact, not to make credibility determinations or weigh the evidence." *Scollick ex rel. United States v. Narula*, No. 14-cv-1339-RCL, 2022 WL 3020936, at *5 (D.D.C. Jul. 29, 2022) (citing *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016)).

**D.      Class Certification**

Federal Rule of Civil Procedure 23 controls the certification of a class.  A representative may sue on behalf of a class of all members only if four conditions are met:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These four conditions are often referred to as numerosity, commonality, typicality, and adequacy, and a class "may only be certified if the trial court is satisfied, after rigorous analysis, that the prerequisites have been satisfied." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

13

"Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Id.* at 351. Parties seeking class certification must "affirmatively demonstrate compliance with the Rule," meaning that the standard is higher than the "mere pleading standard" set forth under Rule 12(b). *Id.* at 350. "Although the D.C. Circuit has not yet articulated a precise standard of proof, the emerging consensus in this District and among the courts of appeals is that the movant must prove each element of Rule 23 by a preponderance of the evidence." *Lewis*, 743 F. Supp. 3d at 194.

If a representative can show they have met all four conditions under Rule 23(a), they must show that the proposed class satisfies "at least one of the three requirements listed in Rule 23(b)." *Wal-Mart*, 564 U.S. at 345. Relevant here, the plaintiffs are seeking class-wide injunctive relief, so they have sought certification under Rule 23(b)(2), which permits the certification of a class if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The plaintiffs have also sought compensatory education awards, asking for certification under Rule 23(b)(3), which permits maintenance of a class seeking damages if "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* 23(b)(3).

## III.    D.C. MOTION TO DISMISS

The Court will separately address the arguments raised by the District's and BOP's motions to dismiss. Before doing so, the Court will briefly note that the thrust of the defendants' arguments indicates a complete abdication of the responsibility that each one owes to the plaintiffs. At the conclusion of this section, therefore, the Court will explain why neither the text of the IDEA nor

the Constitution permit such an abdication in this context. To the extent either defendant feels that the interaction of these statutes imposes an impossible burden on them, their quarrel is with Congress and the statutory regime it has enacted.

**A.    Jurisdictional Arguments**

**1.    The Plaintiffs Have Standing Because an Order from this Court Could Redress Their Injuries**

The District first argues that an order directing it to provide extended eligibility could not redress the plaintiffs' harms "because the BOP—not the District—has physical and legal custody" over the plaintiffs and will not allow access to them. Dist. Mot. to Dismiss 12. This is a challenge to the plaintiffs' standing because it concerns the Court's ability to redress the plaintiffs' harm. The District asserts that because redress depends on the cooperation of a third party, the burden is on the plaintiffs to allege facts showing that the BOP would allow the District access to the plaintiffs. *Id.* at 13 (citing *U.S. Ecology, Inc. v U.S. Dep't of Interior*, 231 F.3d 20, 25–26 (D.C. Cir. 2000)). The District claims that it is "powerless to direct" BOP to allow it access to the plaintiffs, and that the Court could therefore not redress the plaintiffs' harm with an injunction against the District.

But this finger-pointing excuse "rings hollow" for at least two reasons. *See Brown III*, No. 17-cv-348-RDM, 2019 WL 1924245, at *4 (D.D.C. Apr. 30, 2019). For one thing, the District has provided scant evidence that the BOP would not allow compensatory programming to take place at its facilities. The District cites to five paragraphs of the Complaint as proof of "BOP's long-standing refusal to give the District access to its students in its custody is well-documented." Dist. Mot. to Dismiss 13. Without more, the burden has not shifted to the plaintiffs to allege facts that the BOP would allow access to the District in response to an injunction against the District.

But even if the District had provided concrete evidence that the BOP is categorically stopping them from providing a FAPE to the plaintiffs, it "has failed to explain why Plaintiff's placement in the BOP extinguishes its obligations under the IDEA when the statute expressly applies to individuals in 'adult or juvenile *Federal*, State, or local correctional institutions.'" *Brown II*, 324 F. Supp. 3d 154, 161–62 (citing 20 U.S.C. § 1415(m)(1)(D)).  And indeed, the District seems to forget that the relief sought by the plaintiffs is an extension of their eligibility to receive a FAPE, even if that cannot happen until *after* they are released from BOP custody.  *See* Barnes HOD 25 ("The main question in regard to relief relates to whether or not the Student should be granted extended eligibility after s/he is released from prison.").  Therefore, an injunction against the District would still redress the plaintiffs' injuries, even if it is not until after they are released from BOP custody.  The Court finds the District's impossibility arguments unpersuasive. Just because Congress has put the District between a rock (of requiring that it provide a FAPE to plaintiffs under the IDEA) and a hard place (of assigning physical custody over the plaintiffs to the BOP under the Revitalization Act), the plaintiffs' right to a FAPE has not been diminished.

## 2.    The Plaintiffs' Claims Are Not Moot Because the HOD Did Not Provide Them All Requested Relief

The plaintiffs have invoked the IDEA's statutory cause of action, according to which they must be "aggrieved" by the HOD before bringing a suit.  20 U.S.C. § 1415(g)(1).  The District characterizes the plaintiffs' requested relief as "an order declaring that the District has violated their rights under the IDEA" and "an award of compensatory education and intensive evaluations." Dist. Mot. to Dismiss 3 (citing Am. Compl. at 28–29).  Because the plaintiffs already received this relief from the hearing officer, the District argues, they have not been "aggrieved" and therefore cannot sue.  *Id.*

16

While it may be true that the hearing officer "ordered the exact compensatory education services recommended by Plaintiffs' own expert," *id.*, that does not mean that he ordered *all* the relief requested. In the HOD, the hearing officer identified at least seven forms of relief sought by the plaintiffs, namely:

1) a declaration that Respondents denied the Student a FAPE and failed to comply with the IDEA's substantive requirements in violation of federal and local law;

2) an order directing Respondents to authorize comprehensive independent education evaluations for the Student by evaluators of the Student's choice, to include a comprehensive psychological evaluation with educational testing and a comprehensive vocational evaluation;

3) an order directing Respondents to convene an IEP meeting to review the evaluations and update the Student's IEP;

4) an order directing Respondents to provide special education and related services in conformity with the Student's IEP;

5) an order directing that the Student be returned to the District of Columbia to allow him/her to enroll in the high school diploma program at the District of Columbia Department of Corrections;

6) an order extending the Student's IDEA eligibility for two years after the day that s/he can enroll in a special education program that allows him/her an opportunity to complete his/her secondary education; and

7) an order directing Respondents to enter into an agreement with the BOP to place the Student at the District of Columbia Department of Corrections through the period of IDEA eligibility, including any extended eligibility that this Hearing Officer may order, and allow him/her to enroll in the high school diploma program at the District of Columbia Department of Corrections through the period of IDEA eligibility.

*See* Barnes HOD 23. The hearing officer noted that much of the relief was "appropriate" given his finding that "DCPS and OSSE denied the Student a FAPE." *Id.* at 21, 23. The main question for the hearing officer was whether he had the authority to grant requests (5) and (6) above. Despite his "broad discretion" to craft a remedy, *B.D.*, 817 F.3d at 798, the hearing officer determined that he did not have the authority to order extension of eligibility for either of the plaintiffs or order the BOP to return them to D.C. custody, relying in large part on the fact that the *Brown* court did not explicitly discuss or authorize such a remedy. HOD 25. The hearing officer thus denied the relief

sought in requests (5) and (6) above but granted most other relief,[6] specifically crafting a tailored schedule of compensatory tutoring, transition services, and behavioral support.[7]  *Id.* at 26.  The plaintiffs requested more in their administrative complaint than they received, with the hearing officer explicitly denying several specific forms of relief.  The IDEA recognizes that such a denial is an Article III injury, *TransUnion*, 594 U.S. at 427, and the plaintiffs were aggrieved by the HOD's refusal to grant them all requested relief.  Their claims are therefore not moot.

### 3.    The Plaintiffs' Claims Fall Under the Inherently Transitory Exception to Mootness

The District next argues that because both plaintiffs have "aged out"—that is, the school year in which they turned twenty-two has now passed and they are therefore not eligible for special education under the IDEA—they are barred from seeking prospective relief.  Dist. Mot. to Dismiss 12 (citing Am. Compl. at 29).  Specifically, the District notes that Plaintiff McNeal aged out before the filing of the Complaint, and he therefore lacks standing to sue.  *Id.*  Meanwhile, because Plaintiff Barnes aged out during the pendency of this litigation, the District claims that his claim for prospective relief is moot.  *Id.*  The plaintiffs argue that their claims are not moot because of the "inherently transitory" exception to mootness.  Pl.'s Opp'n to Dist. 11.  Under this exception, courts consider "(i) whether the individual claim might end before the district court has a reasonable amount of time to decide class certification, and (ii) whether some class members will

---

[6] The HOD ordered a comprehensive evaluation to satisfy request (3) in the plaintiffs' complaint but recognized that it could not be completed while the plaintiffs were incarcerated absent BOP cooperation.  Barnes HOD 26.

[7] The requested relief included a request for "an order for Respondents to convene an IEP meeting to review the Student's evaluations and update his/her IEP"; "an order that the Student be returned to the District of Columbia to allow him/her to enroll in the high school diploma program at the District of Columbia Department of Corrections"; and "an order directing Respondents to enter into an agreement with the BOP to place the Student at the District of Columbia Department of Corrections through the period of IDEA eligibility and allow him/her to enroll in the high school diploma program at the District of Columbia Department of Corrections."  Barnes HOD 23; McNeal HOD 24. Because the plaintiffs have not raised claims that they were "aggrieved" by the denial of these requests, the Court will not consider them here.

retain a live claim at every stage of litigation." *J.D.*, 925 F.3d at 1311.  This Court has held that the inherently transitory exception to mootness can apply in "any situation where composition of the claimant population is fluid, but the population as a whole retains a continuing live claim." *DL v. Dist. of Columbia*, 302 F.R.D. 1, 20 (D.D.C. 2013) (Lamberth, C.J.) (internal quotations omitted).[8]

Because students lose their IDEA eligibility at age twenty-two and the IDEA requires an administrative hearing before plaintiffs can bring their claims in federal court, their claims will often be inherently transitory.  *Cf. M.A. ex rel. E.S. v. Newark Pub. Schs*, No. 01-cv-3389-SRC, 2009 WL 4799291, at *10 (D.N.J. Dec. 7, 2009) ("IDEA claims are without question inherently transitory" because in "a typical challenge regarding whether a child has received a FAPE, as guaranteed by the IDEA, the school year or years at issue will have long since concluded by the time the dispute even enters the federal courthouse, much less reaches resolution.").  The present case falls squarely within that description.  Plaintiff McNeal has been incarcerated since January 2019, when he was about eighteen years old.  Compl. ¶¶ 69, 82.[9]  The Complaint was not filed until March 2024, over five years after he was first incarcerated, because he had to exhaust administrative remedies under both the IDEA and the BOP's internal policies, discussed *infra*.  Plaintiff Barnes, meanwhile, has been incarcerated since September 2021, when he was about nineteen years old.  Compl. ¶ 43, 52.[10]  As new IDEA-eligible students enter the BOP and existing students age out, the class will certainly be fluid even as the identity of the class remains stable.

---

[8] As discussed in more detail below, a class will be certified on the narrow claims permitted to go forward pursuant to this Opinion.
[9] To elaborate, Plaintiff McNeal turned 22 during the 2022–23 school year, meaning he was either born in 2000 or 2001.  In January 2019, therefore, he was either 18 or 19 years old.
[10] Plaintiff Barnes turned 22 during the 2023–24 school year, meaning he was born either in 2001 or 2002.  In September 2021, he was therefore either 19 or 20 years old.

The District says that even if the inherently transitory exception applies, it does not cure the standing issue for Plaintiff McNeal, who aged out before the Complaint was even filed. Dist. Repl. 4. But the D.C. Circuit has recognized that in order "[t]o fully compensate a student, [relief by a district court for denial of a FAPE] must seek not only to undo the FAPE denial's affirmative harm, but also to compensate for lost progress that the student would have made." *See B.D. v. Dist. of Columbia*, 817 F.3d 792, 798 (D.C. Cir. 2016). In other words, the only way to fully compensate a student for lost a FAPE is to place them in the position they would have been in had they received a FAPE during their eligibility period. *Id.* Here, the compensation sought by Plaintiff McNeal is an extension of his eligibility so that he can make up for the nearly five years of eligibility he lost while incarcerated. The facts alleged in the Complaint make clear that both the plaintiffs were well on their way to achieving a high school diploma. *See* Compl. 49 (alleging Plaintiff Barnes had achieved 19.5 of a necessary 24 credits at the time of his incarceration at age 19 or 20); *id* at 75 (showing Plaintiff McNeal had achieved 15 of the necessary 24 credits at the time of his incarceration at age 18 or 19). Therefore, an extension of eligibility could redress the plaintiffs' harm by placing them in the same position as they would have been had they received a FAPE during their years of eligibility.

### B.    The Plaintiffs Were Aggrieved by the Hearing Officer's Decision Not to Award Them Extended Eligibility for the District's Denial of a FAPE and Have Therefore Stated a Claim Upon Which Relief Can Be Granted

The District argues that even if the plaintiffs have surmounted the jurisdictional hurdles presented by standing and mootness, they nevertheless have failed to state a claim upon which relief can be granted and their Complaint should be dismissed under Rule 12(b)(6). The plaintiffs have invoked this Court's subject matter jurisdiction under 20 U.S.C. § 1415(i)(2)(A). Under that

provision, plaintiffs may only bring a claim in federal court if they have been "aggrieved" by a

HOD. But, says the District, the plaintiffs have not been aggrieved by any part of the HOD. Dist.

Mot. to Dismiss 14. Instead, in their operative Complaint, the plaintiffs have sought a declaratory

judgment that the District violated four specific provisions of the IDEA, including

§ 1412(a)(1)(A), the provision requiring that the District provide a FAPE to eligible students.[11] *Id.*

at 15. The District argues that the plaintiffs cannot have been aggrieved by the HOD with respect

to this violation because the hearing officer already declared that the District was denying a FAPE

to them and awarded them compensatory educational services. *Id.* Thus, the plaintiffs were not

"aggrieved" by his decision and their Complaint fails to state a claim upon which relief can be

granted and must be dismissed.

 Not so fast, say the plaintiffs. While the hearing officer did declare that the District had

failed to provide a FAPE to the plaintiffs in violation of § 1412(a)(1)(A), the plaintiffs also "did

not receive *all the relief* they requested in their due process complaints." Dist. Mot. to Dismiss 17

(emphasis added). The hearing officer awarded the following compensatory education to Plaintiff

Barnes: (i) 125 hours of compensatory tutoring; (ii) thirty hours of transition services; and (iii)

twenty hours of behavior support services. Barnes HOD 26. He awarded even more compensatory

education to Plaintiff McNeal, given his younger age at the time the District ceased to offer him

an IDEA-compliant special education: (i) 450 hours of compensatory tutoring; (ii) sixty hours of

transition services; and (iii) fifty-five hours of behavioral support services. McNeal HOD 27–28.

But the plaintiffs requested more relief, including "extended eligibility" for enough time to allow

---

[11] The Court agrees with the District that the plaintiffs cannot have been aggrieved by the hearing officer's decision with respect to §§ 1412(a)(3)(A) and 1415(j) because they did not raise any claims related to those provisions at the due process hearing, and instead, raise them for the first time in the Complaint. *Id.* at 13–14 (citing Barnes HOD 4–5, McNeal HOD 6). The Court also agrees with the District that the final provision invoked by the plaintiffs, § 1400(d)(1)(A), simply states the purpose of the statute without creating any "affirmative obligation." *Id.* at 14. The plaintiffs have therefore failed to state a claim upon which relief could be granted for any potential violations of those provisions.

each plaintiff to enroll in a program to earn their high school diploma. *Id.* at 22; McNeal HOD 26. The plaintiffs therefore allege that they were "aggrieved" by the HOD in two ways: (i) their compensatory education award was "insufficient;" and (ii) they were entitled to extended eligibility. Compl. ¶ 13; *see also id.* at 29 (seeking relief in the form of an award of extended eligibility).

A district court reviewing a hearing officer's decision must "assess[] whether the appealing party has 'persuad[ed] the court that the hearing officer was wrong.'" *B.D.*, 817 F.3d at 23 (citing *Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 522 (D.C. Cir. 2005)). The District is correct that the plaintiffs have not pleaded any facts to show that they were aggrieved by the hearing officer's award of compensatory education, and its Motion will be granted as to those claims. Nowhere do the plaintiffs state that their compensatory awards, either in terms of the hours or specific services awarded, were "wrong." Instead, they seek an order "requiring Defendants to provide or otherwise ensure the provision of a FAPE to Plaintiffs and similarly situated students and to provide Plaintiffs and similarly situated students with compensatory education." Compl. ¶ 18. But this is exactly what the hearing officer provided by declaring that the District had denied the plaintiffs a FAPE and awarding compensatory education to remedy that failure. *See* Barnes HOD 21–22 (finding that the District "denied the Student a FAPE by failing to provide the Student with any special education services during the two years prior to the filing of the Complaint"); McNeal HOD 23 ("DCPS and OSSE denied the Student a FAPE by failing to provide him/her with any special education services during the two years prior to the filing of the Complaint."). Therefore, the order that the plaintiffs seek—requiring the District to ensure provision of a FAPE—would amount to an impermissible enforcement order. *B.D.*, 817 F.3d at 801.[12] The

---

[12] The District misrepresents the holding of *B.D.* as "squarely [holding] that the IDEA does not provide a cause of action to enforce a favorable hearing officer decision." Dist. Mot. to Dismiss 18. But this is not true. The Circuit

plaintiffs have not been aggrieved by the hearing officer's award of compensatory education, and their claim for an award of compensatory education will be denied.

However, the plaintiffs have pleaded sufficient facts to establish a plausible claim that the hearing officer's denial of extended eligibility was "wrong." As the hearing officer himself noted, the "main question" in regard to relief was whether or not the plaintiffs should be granted extended eligibility under the IDEA. Barnes HOD 25; McNeal HOD 26. Because he could not find any authority to order such relief, despite some evidence indicating that programs might be available for the plaintiffs upon their release, he denied their request for extended eligibility. Barnes HOD 25; McNeal HOD 27. One of the purposes of the IDEA is to "prepare [students with disabilities] for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). Fulfilling this purpose seems just as critical for students like Barnes and McNeal, who have fallen off the educational track and onto the school-to-prison pipeline, as it does for students with disabilities who have stayed on the path. And Courts have broad discretion to ensure these purposes are fulfilled, as the statute grants the authority to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). Plaintiff Barnes is scheduled for release from incarceration on October 24, 2025. BOP Mot. to Dismiss 2, ECF No. 30. Plaintiff McNeal is eligible on February 27, 2027. *Id.* at 3. And as noted *supra*, both are well on their way to earning their degrees. An award of extended eligibility could very well fulfill the purposes of the IDEA in preparing these plaintiffs for employment and independent living so they can be productive members of society. The plaintiffs have stated a plausible claim for that relief.[13]

---

constrained its opinion to whether a specific provision of the IDEA, § 1415(i)(2)(a), provided an enforcement cause of action. While it held that the section did not, the D.C. Circuit "reserve[d] . . . for a later case" whether some other provision of the IDEA might provide for such enforcement. Because the plaintiffs do not make such an argument here, this Court will also reserve judgment as to that question.

[13] Of course, there are thorny issues that would need to be addressed, such as the hearing officer's concern about introducing the plaintiffs into a high school setting with younger students given their advanced age. But at the motion-

## IV.    BOP MOTION TO DISMISS

The Court now turns to the claims in the BOP's Motion to Dismiss. As a threshold matter, the parties and the Court all agree that the BOP is not subject to the provisions of the IDEA. BOP Mot. to Dismiss 7; Pl.'s Opp'n to Dist. 23 (both citing *Brown II*, 324 F. Supp. 3d at 159–60). The plain text of the IDEA says that "states" must make a FAPE available to children with disabilities residing within the state to be eligible for federal funding. 20 U.S.C. § 1412(a). States, in turn, are defined as "each of the fifty States, the District of Columbia, the Commonwealth of Puerto Rico, and each of the outlying areas." *Id.* § 1401(31). However, this does not absolve the BOP of its obligations to the plaintiffs under the Constitution. As the Court will explain, the IDEA has conferred a property interest in a FAPE on the plaintiffs, and if the BOP is categorically denying access to that property right without due process, it does so in violation of the Due Process Clause.

In its Motion to Dismiss, the BOP raises four primary arguments in response to the plaintiffs' claim. First, they argue that the plaintiffs have not exhausted their administrative remedies as required by the Prison Litigation Reform Act of 1996 (the "PLRA"), and this Court therefore does not have jurisdiction to hear them. Next, they argue that even if plaintiffs have exhausted their administrative remedies, the BOP's literacy program and pathways to a GED offered an adequate alternative to a FAPE. Third, the BOP argues that the plaintiffs do not have a protected property interest in a FAPE, and their access to a FAPE is therefore not entitled to protection under the due process clause. Finally, the BOP argues that even if the plaintiffs did have a protected property interest, the BOP's administrative remedy process provided the plaintiffs all the process they were due under the Fifth Amendment. The Court will discuss why each of these arguments is unavailing.

---

to-dismiss stage, the Court need not be concerned with the intricate details of how it would craft hypothetical equitable relief.

**A.    The Plaintiffs Have Sufficiently Pleaded Facts to Indicate They Exhausted Their Administrative Remedies Under the PLRA**

**1.    The BOP's Administrative Remedies Program**

The BOP argues that the plaintiffs failed to exhaust their administrative remedies under the PLRA and that their claims in this court must be dismissed.  Under the PLRA, plaintiffs must exhaust all "administrative remedies as are available" before bringing an action under "any . . . Federal law."  42 U.S.C. § 1997e.  BOP inmates must "complete the administrative review process in accordance with the applicable procedural rules . . . [of] the prison grievance process." *Jones v. Bock*, 549 U.S. 199, 218 (2007).  It is undisputed that "failure to exhaust is an affirmative defense under the PLRA." *Id.* at 216.  As such, the burden is on the defendants to demonstrate "that an administrative remedy was available and that [the plaintiff] failed to pursue it." *Savage v. U.S. Dep't of Just.*, No. 21-cv-1057-CKK, 2022 WL 2982170, at *4 (D.D.C. Jul. 28, 2022) (quoting *Crouch v. Brown*, 27 F.4th 1315, 1320 (7th Cir. 2022).

The BOP has a four-step administrative remedies program ("ARP"). 28 C.F.R. §§ 542.10–542.19.  A slew of individuals is involved along the petitioner's journey toward administrative relief, beginning with on-site staff members and going up through the Warden, Regional Director, and finally, the BOP Office of General Counsel. *Id.*[14]  At Step 1, a petitioner must file an Informal Resolution Form (BP-8).  BOP Mot. to Dismiss 10.  If the response does not alleviate the petitioner's concern, the petitioner moves to Step 2, where they file an Administrative Remedy Request (contained in form BP-9) with the Warden within twenty days of the event(s) giving rise to their grievance. *Id.*  The twenty-day timeline is strictly enforced, and any request filed after twenty calendar days of the aggravating event is not considered. *Id.*  Step 3 involves filing of a

---

[14] The BOP's Motion lays out the steps in orderly fashion, and, having assured itself the BOP's representations accurately reflect the regulations cited, the Court will mostly reference the Motion in describing the ARP.

BP-10, which is an appeal from the BP-9 made to the Regional Director within twenty days of the denial. Finally, if the BP-10 appeal is unsuccessful, Step 4 involves filing another appeal (BP-11) to the BOP's General Counsel, who has up to sixty days to respond. *Id.* "A final decision from the Office of General Counsel completes the administrative remedy program." *Id.* Critically, if a petitioner does not receive a response from the BOP within the time frames stated above, they may "consider the absence of a response a denial at that level" and appeal the decision. *Id.*

### 2. Both Parties Have Submitted Sworn Declarations in Support of Their Case, but the Court Will Decline the BOP's Invitation to Follow the Summary Judgment Standard

In support of their claim that the plaintiffs did not exhaust the ARP process, the BOP submits a declaration by Patrick Kissell, who is an Administrative Remedy Specialist for the BOP. Kissel Decl. ¶ 1, BOP Mot. to Dismiss, ECF No. 30-2. Mr. Kissel has provided testimony in his declaration that he has access to all "appeal files kept in the ordinary course of business by BOP." Kissel Decl. ¶ 1. He states that he is familiar with the BOP's SENTRY computer system, which stores information on administrative complaints filed by inmates and can generate a report summarizing all BP-9s, BP-10s, and BP-11s filed by a federal inmate. *Id.* at ¶¶ 3, 6. As part of this litigation, Kissel reviewed the SENTRY reports for Plaintiffs Barnes and McNeal. He found that there was only one record of a remedy request from Mr. Barnes, which "the Warden responded to" and from which Mr. Barnes "did not file any appeals." *Id.* ¶¶ 8–9. He further testifies that Mr. McNeal submitted a remedy request to enroll in education classes in June 2023 but withdrew the request on July 20, 2023. *Id.* ¶ 10. Based on this review of the record, Mr. Kissel avers that neither of the plaintiffs has exhausted their administrative remedies through the BOP's ARP. *Id.* ¶ 12.

Both plaintiffs dispute this conclusion, claiming to have exhausted their administrative remedies.  In support of his claims, Mr. Barnes submitted a declaration in which he testifies that after filing his first BP-8 in February 2023, he "never received a response" from the BOP.  Pl.'s Opp'n to BOP 9.  Nevertheless, he failed to file a timely BP-9, allegedly because he was housed in the BOP's Special Housing Unit and therefore could not file an appeal.  After filing his third BP-8 in December 2023 and receiving no response, Mr. Barnes claims that he timely submitted a BP-9 that same month.  *Id.* at 10.  He claims that after receiving no response to his BP-9, he then submitted a BP-10 "via mail" to the Regional Director in January 2024.  *Id.*  He claims that the principal of the GED program mentioned to him that he'd seen the grievance requests, although it is unclear whether he means the BP-8 requests or all requests, including the appeals.  *Id.*  He states that after again hearing nothing from BOP, he submitted a BP-11 in February 2024.  *Id.*

Plaintiff McNeal has also submitted an affidavit to rebut the testimony of Mr. Kissel, claiming that he filed a BP-8, BP-9, and BP-10.  *Id.* at 11.  In addition to claiming that he received "no response" to these requests, Mr. McNeal claims that after the filing of his BP-10 he was brought into a meeting with the Lieutenant, Warden, and Educational Director at FCI Pollock, where he was incarcerated at the time of these filings.  *Id.*  In that meeting, the BOP officials allegedly informed Mr. McNeal that nothing "could be done by anyone to allow [Mr. McNeal] to get a high school diploma," and told him that their meeting represented "final resolution" of the matter.  *Id.*  Understanding their statement to mean that he had exhausted the administrative-remedies process, Mr. McNeal proceeded to file suit in this Court.  *Id.* at 12.

In rebutting the plaintiffs' claims, the BOP invites this Court, pursuant to Rule 12(d) of the Federal Rules of Civil Procedure, to treat their motion as one for summary judgment under Rule 56.  When a defendant "expressly moves for summary judgment in the alternative to a motion to

dismiss . . . the Court *may* treat the motion as one for summary judgment." *Smith v. Lynch*, 106 F. Supp. 3d 20, 36 (D.D.C. 2015). But the Court declines the BOP's invitation to treat this motion as one for summary judgment, because summary judgment is generally appropriate only after "adequate time for discovery." *See* Pl.'s Opp'n to BOP 12 n.2 (citing *Celotex*, 477 U.S. at 322). Indeed, pre-discovery summary judgment is "usually a disfavored practice." *Tabb v. District of Columbia*, 477 F. Supp. 2d 185, 188 n.1 (D.D.C. 2008). The instant case shows why. The plaintiffs have already noted the "asymmetrical" information that exists at this stage. While the BOP has filed the Kissel Declaration in support of its motion for summary judgment, much of the rebuttal offered by the plaintiffs would need to be corroborated (or not) by agents of the BOP (the Warden, Lieutenant, and Educational Director at FCI Pollock, for Mr. McNeal, and the principal of the GED program at USP Cannan for Mr. Barnes). In the absence of such corroboration, the plaintiffs are left to respond to the assertions in the Kissel declaration with affidavits of their own. This would likely be enough, even under the summary judgment standard, to create a "genuine issue of material fact." *See Anderson*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

Instead, the Court will treat the BOP's Motion as a motion to dismiss for lack of subject matter jurisdiction. In doing so, the Court is required to "accept as true all of the factual allegations contained in the complaint." *Am. Freedom L. Ctr. v. Obama*, 821 F.3d 44, 49 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n. 1 (2002)). However, courts "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Id.* (quoting *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C.Cir.2005)).

3.    **Considering All Materials Before the Court and Accepting as True All Factual Allegations in the Complaint, the Plaintiffs Have Pleaded Sufficient Facts to Show They Exhausted Their Administrative Remedies**

Accepting the alleged facts as true and considering both the Kissel Declaration and the plaintiffs' affidavits, the plaintiffs have undoubtedly pleaded facts sufficient to show they have exhausted their administrative remedies, and the BOP has therefore not met its burden to prove this affirmative defense. While the plaintiffs have made a showing that they exhausted their administrative remedies, they state that they do not have sufficient information at this stage of the litigation to rebut Mr. Kissel's declarations regarding the absence of any record of their ARP filings in the SENTRY program. *Id.* at 12. However, they note that their ARP filings could have been "misplaced or destroyed." *Id.* It is also possible, the plaintiffs claim, that the BOP could have omitted or incorrectly logged the information into SENTRY. *Id.*

The BOP states that it is purely speculative to allege that they deliberately or inadvertently destroyed or misplaced the plaintiffs' BPs. BOP Repl. 2. It further states that the plaintiffs have submitted no "concrete reasons" as to how SENTRY might be unreliable. But the gravamen of the plaintiffs' allegations is not that SENTRY is unreliable, but rather that the BOP agents entering the data are. *See* Pl.'s Opp'n to BOP 12 (alleging that "someone in the chain of BOP personnel" could have meddled with the plaintiffs' BP forms). While these claims might seem speculative in some circumstances, the BOP does not stand on neutral ground in this case. The hearing officer for both plaintiffs found that the BOP has "simply refused" to allow the District to access students covered by the protections of the IDEA since at least 2019. McNeal HOD 17. Indeed, at the plaintiffs' due process hearing, the BOP refused "to answer any specific questions about the offender's access to diploma programs and special education services." *Id.* at 8. Based on these

29

facts, which exhibit the BOP's continued hostility toward these and other similarly situated inmates, it is entirely plausible that BOP agents destroyed or misplaced the plaintiffs' ARP filings.

The BOP has submitted a sworn statement from Mr. Kissel that there is no record in the SENTRY program of plaintiffs exhausting the BOP's administrative remedies process. The plaintiffs, for their part, have submitted affidavits that they have exhausted those remedies. They further indicate that without the benefit of discovery, they do not have sufficient information to rebut the claim by Mr. Kissel that SENTRY contains no record of their exhaustion. At this stage, the Court is satisfied that the plaintiffs have pleaded sufficient facts to show that they have exhausted their administrative remedies under the BOP's ARP.

### B.    The BOP Literacy Program is not an Adequate Alternative to a FAPE

The BOP argues that even if the plaintiffs exhausted their administrative remedies, they nevertheless fail to state a claim because they have simply refused the available educational services provided by BOP. BOP Repl. 7–8. The BOP notes that Plaintiff Barnes, for example, was told that "classes of all levels" were available to him, and that he could receive tutoring from fellow inmates to assist with the GED test. BOP Mot. to Dismiss 11. Because the BOP has offered a reasonable alternative to the plaintiffs' requested relief in the form of its literacy program, the BOP argues that the ARP has provided an administrative remedy.

The plaintiffs, and this Court, disagree. An inmate must exhaust only those remedies that are "available." *Ross v. Blake*, 578 U.S. 632, 642 (2016). And a remedy is only "available" if it offers "'the possibility of some relief for the action complained of,' is 'capable of use for the accomplishment of a purpose,' and 'is accessible or may be obtained.'" *Savage v. U.S. Dep't of Just.*, No. 21-cv-1057-CKK, 2022 WL 2982170, at *5 (citing *Booth v. Churner*, 532 U.S. 731, 737–38 (2001)).

Here, the "action complained of" is the denial of a FAPE to the plaintiffs. While a GED may be "the equivalent of a school diploma" for *most* students, BOP Mot. to Dismiss 20, it does not offer the possibility of any relief for the denial of a FAPE. The entire point of the IDEA is to provide students with disabilities "appropriate special education and related services, and aids and supports in the regular classroom." 20 U.S.C. § 1400(c)(5)(D). But simply offering a literacy program and classes toward a GED is not the same as offering appropriate special education and related services for students, like plaintiffs, with learning disabilities. The panoply of services afforded to the plaintiffs based on their IEP was not available to the students upon their confinement in BOP, and even if the plaintiffs exhausted their administrative remedies, those services still would not have been "accessible" or "obtain[able]." The ARP provided by the BOP leads the plaintiffs to a dead end, because resolution of the ARP could never result in a FAPE. The remedy sought by the plaintiffs is a FAPE; a FAPE is not available under the prison's remedial processes; and the only remedial alternative available from the BOP, namely a GED, is not an adequate alternative for the FAPE.

### C.    The Plaintiffs Have a Protected Property Interest in a FAPE

The BOP next argues that due process does not compel them to provide any protections to the plaintiffs because the plaintiffs' entitlement to a FAPE is not a protected property interest subject to the Due Process Clause. Under the Due Process Clause of the Fifth Amendment, individuals have a general right to receive "notice and an opportunity to be heard before the Government deprives them of property." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993). The BOP argues that the Constitution does not provide the plaintiffs a substantive due process right in a FAPE; that the D.C. Municipal Code regulations implementing the IDEA cannot be construed to provide them a protected property interest in a FAPE; and finally,

that the IDEA is not a "statutory mandate," and therefore it cannot confer a property interest to the plaintiffs. Each of these arguments fails.

### 1.    The Plaintiffs Do Not Have a Constitutional Right to a FAPE

The BOP first frames the due process question here as one of "assessing whether for individuals in federal custody, there is a right to education explicitly or implicitly guaranteed by the Constitution." BOP Mot. to Dismiss 15 (citing *Eisenstadt v. Baird*, 405 U.S. 438 (1972)). But the answer to that question, conceded by the plaintiffs, is clearly no. The Supreme Court has consistently rejected that education is a fundamental right guaranteed to individuals under the Constitution. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 37 (1973) (finding the arguments in favor of a fundamental right to education "unpersuasive"). The plaintiffs readily concede that there is no fundamental or substantive due process right to education. Pl.'s Opp'n to BOP 22. The real question, therefore, is whether the plaintiffs have a protected property interest in a FAPE arising from the IDEA and implementing D.C. regulations, which amount to state law. *Id.* The answer to that question is, just as clearly, yes.

### 2.    The IDEA and D.C. Municipal Regulations Confer a Protected Property Interest in a FAPE on Plaintiffs That Cannot be Denied Without a Pre-Deprivation Hearing

Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). The plaintiffs state that they have a property interest in a FAPE conferred by myriad D.C. regulations that implement the IDEA by, among other things, establishing DCPS as the LEA for the plaintiffs and OSSE as the SEA. Pl.'s Opp'n to BOP 25. Acknowledging that BOP is not bound by the regulations established by the District, the plaintiffs

nonetheless argue that the regulations establish a property interest in a FAPE "predicated on the IDEA." *Id.* (citing *Swindle v. Livingston Par. Sch. Bd.*, 655 F.3d 386, 392 (5th Cir. 2011)). They argue that because property interests can "include rights to government benefits such as . . . public education," they are entitled to the accompanying due process protections afforded to such property interests. *Id.* at 25–26 (citing *Turner v. Dist. of Columbia*, No. 04-cv-0048-RMC, 2006 WL 566121 (D.D.C. Mar. 7, 2006)).

In response, the BOP says that relying on the District regulations as the source of a protected property interest "stretch[es] the plain language of the relevant regulations." BOP Mot. to Dismiss 13. It states that the regulations "are simply inapplicable to individuals who are housed at federal prisons," and that because the plaintiffs are not under the purview of an LEA while incarcerated at BOP facilities, they are no longer entitled to a FAPE. *Id.* at 14.

The BOP is wrong that incarceration makes the District's regulations "inapplicable" to the plaintiffs. The regulations explicitly state that incarceration only relieves the District of its obligations to students who were "not actually identified as being a child with a disability" and "[d]id not have an IEP in accordance with" the IDEA immediately prior to their incarceration. D.C. Mun. Regs. tit. 5-A, § 3001.16 (2022). Plaintiff Barnes's most recent IEP was issued in April 2021, just five months before his confinement in BOP began. Compl. ¶ 50. And Plaintiff McNeal's most recent IEP was issued in December 2018, mere *weeks* before he was sentenced by the D.C. Superior Court and committed to BOP custody. *Id.* at ¶ 76. Nothing in the record indicates that either of these IEPs was somehow extinguished upon the plaintiffs' commitment to BOP facilities. The LEA's obligation to both plaintiffs, and therefore the property interest they had in a FAPE, has remained intact throughout the plaintiffs' incarceration.

The BOP believes that the holding of *Brown II* "reject[s] the notion that individuals in Bureau custody are entitled to [a FAPE]." BOP Mot. to Dismiss 13 (citing *Brown II*, 324 F. Supp. 3d at 159–160). But this overstates the holding in *Brown II*. The court there only said that the BOP does not have to assume responsibilities for special education services that the IDEA clearly assigns to the states. *Brown II*, 324 F. Supp. 3d at 159 (citing *Brown I*, 2018 WL 774902, at *7– 10). It never said that the plaintiffs were not *entitled* to a FAPE. Indeed, the *Brown I* court[15] recognized that D.C. Offenders were "undeniably entitled" to special education services under the IDEA. *Brown I*, 2018 WL 774902, at *7. The *Brown II* court simply held, as this Court has, that the plain reading of the statute precludes a finding of liability against BOP on the plaintiffs' IDEA claims. And unlike the plaintiffs here, the plaintiffs in the *Brown* cases did not raise any procedural due process challenges to the BOP's policies in refusing them a FAPE. *See* Compl. at 12, *Brown v. District of Columbia*, No. 17-cv-348, ECF No. 1 (raising no due process claims and seeking only a declaration that "the Defendants violated the IDEA and the District of Columbia Municipal Regulations at Title 5-E § 3000, et seq., by denying Plaintiff a FAPE").

Finally, the BOP says that the plaintiffs' interest in a FAPE cannot be a property interest protected by due process because the IDEA is not a "statutory mandate." BOP Repl. 11. At first glance, their argument makes some sense—the IDEA was enacted pursuant to Congress's spending power, and states have the discretion to opt in. If they choose to opt in and receive the federal funding, they must implement the procedural safeguards outlined in the IDEA to ensure provision of a FAPE to disabled students. Therefore, because providing a FAPE is a "condition for a state to receive federal funding," the BOP argues that implementation of the IDEA is "entirely a matter of state political decisions," and the IDEA can therefore provide no guarantee to

---

[15] *Brown I* was decided by a magistrate judge, whose report and recommendation ("R&R") was adopted in full on this specific point by the district judge.

individuals that a plaintiff will receive a FAPE.[16]  BOP Repl. 11.  But the District undeniably has

opted into the IDEA and therefore has guaranteed a FAPE to its residents, including the plaintiffs.

Therefore, the plaintiffs are entitled to a FAPE under that statutory scheme.

The chief case the plaintiffs rely on is *Goss v. Lopez*, 419 U.S. 565 (1974).  In *Goss*, two

Ohio high school students challenged their suspension from school without a hearing.  *Id.* at 571.

A three-judge panel found that the suspension violated the students' due process rights.  *Id.*  The

school district appealed that ruling, arguing (much like the BOP does here) that there is "no

constitutional right to an education at public expense."  *Id.* at 572.  As the Supreme Court noted,

that argument "misconceives the nature of the issue," reframing the case as a procedural due

process challenge.  *Id.*  The Court held that, "on the basis of *state* law," the students "plainly had

legitimate claims of entitlement to a public education" and should have been afforded due process

protections.  *Id.* at 573 (emphasis added) (citing the Ohio statute that established a right to free

public education for students through age twenty-one).  The plaintiffs assert their entitlement to a

FAPE is, like the Ohio students' entitlement to a public education, a property interest conferred on

the basis of state law, here IDEA and the D.C. Municipal Regulations.  Compl. ¶ 140.

The BOP resists the conclusion suggested by *Goss*, arguing that *Goss* is inapplicable

because the plaintiffs cite "no statute, rule, regulation, or other entitlement to access to education

while in federal custody."  But this is simply a repetition of the arguments in the BOP's Motion to

Dismiss that the Court rejected *supra*.  *See* Mot to Dismiss 17.  To reiterate, the statute makes clear

as day that the IDEA is applicable to students "incarcerated in adult or juvenile Federal, State, or

local correctional institution."  20 U.S.C. § 1415(m)(1)(D).  And while it may be true that the

---

[16] Indeed, the BOP even notes that at least one state, New Mexico, did not initially opt into the IDEA's scheme and was therefore not obligated to provide children residing within the state a FAPE.  *Id.* (citing *Bd. of Educ. v. Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 184 (1982)).

IDEA does not create a mandate on its face, once states have opted in, they must provide a strong set of procedural protections to disabled students to ensure they receive a FAPE. *Id.* § 1412. And the District has chosen to opt in and therefore extend those procedural rights to students residing in its borders, resulting in the creation of over 100 pages of procedure to ensure students actually receive the FAPE to which the District has entitled them. In *Goss*, the Supreme Court recognized that once it "chose[] to extend the right to an education to people of appellees' class generally, Ohio [could] not withdraw that right on grounds of misconduct absent[] fundamentally fair procedures to determine whether the misconduct has occurred." *Goss*, 419 U.S. at 736. Like Ohio in *Goss*, the District has "chosen to extend the right" of a FAPE to the plaintiffs, and therefore it "may not withdraw that right absent fundamentally fair procedures."

Once the District conferred that property interest in a FAPE on plaintiffs, no government entity could deprive them of it without prior notice and opportunity to be heard. The Court will next discuss the plaintiffs' claims that the BOP has failed to provide these fundamental protections to them.

### D.    The ARP Did Not Provide Sufficient Process to the Plaintiffs

The BOP's final argument is that even if a FAPE were a property interest protected by due process, "the [ARP] process afforded to Plaintiffs withstands judicial scrutiny," which the Court takes to mean "satisfies the requirements of due process." Mot. to Dismiss 18. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Usually, due process entails "at a minimum . . . that deprivation of life, liberty or property by adjudication be *preceded* by notice and opportunity for hearing appropriate to the nature of the case." *Goss*, 419 U.S. at 579 (emphasis added). According to the plaintiffs, they stopped receiving a FAPE the moment they entered BOP

custody. And the BOP offers no evidence that this deprivation was preceded by notice or a meaningful opportunity to be heard. Instead, the BOP argues that the ARP process provided the plaintiffs with a meaningful postdeprivation procedure, which they argue the Supreme Court has endorsed in the context of a prison setting. BOP Repl. 16 (citing *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("[U]nauthorized intentional deprivation of property . . . does not constitute a violation of the procedural requirements of the Due Process Clause . . . if a meaningful postdeprivation remedy for the loss is available.")).

The problem for the BOP is that the Supreme Court requires a *meaningful* postdeprivation process, even in a prison setting. Even if the ARP provided sufficient safeguards to satisfy the protections of due process, the light at the end of the tunnel for the plaintiffs still is not a FAPE. The Court has already discussed why the BOP's literacy program and GED offerings do not provide the plaintiffs with an "available" remedy under the PLRA. For the same reasons, the BOP's argument here—that their literacy program offers the plaintiffs an opportunity to further their education—falls flat. As the BOP describes it, the literacy program is designed as a "first step toward adequate preparation for successful post-release reintegration into society" and considered a prerequisite for students hoping to sit for the GED. *Id.* And students' attendance is *mandatory*, or they risk facing disciplinary measures. Mot. to Dismiss 20.

For one thing, Congress made explicit findings that children with disabilities need "positive behavioral interventions and supports," so a program that punishes them for not complying with the educational programs is an affront to the purposes of the IDEA. Furthermore, these students already have a carefully tailored program in place to adequately prepare them for post-release integration into society. Congress has found that the best way for disabled students, like the plaintiffs, to be prepared for employment and independent living is through a FAPE. And it has

also found that the best way to guarantee the provision of a FAPE to these children is through the IEP, which is the "centerpiece of the [IDEA]'s education delivery system." *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 166–67 (2017). The plaintiffs are "not complaining that they do not have access to the BOP's literacy program, or a GED program." Pl.'s Opp'n to BOP 18. Rather, they are complaining that the BOP is depriving them of the guarantee of a FAPE made to them by Congress and the District. The BOP's literacy program, "including any GED program, does not constitute alternative or acceptable relief." Pl.'s Opp'n to BOP 17.

The BOP has allegedly deprived plaintiffs of access to their statutorily conferred FAPE. It has done so without providing the plaintiffs any predeprivation procedure, insisting instead that the plaintiffs avail themselves of the BOP's internal postdeprivation grievance procedure. But that procedure does not give plaintiffs a "meaningful" opportunity to be heard because it would not provide plaintiffs access to a FAPE even if it were completely exhausted. For this reason, the BOP's final argument fails and its Motion to Dismiss must be denied.

### E.    The Defendants Cannot Abdicate Responsibility by Finger Pointing

As a closing note, the Court will address a theme underlying both defendants' arguments: that it is not their fault that Congress has created two conflicting statutory regimes in the IDEA and Revitalization Act. As discussed above, the District claims that because BOP has physical and legal custody over the plaintiffs and has categorically blocked the District's representatives from accessing them, it is impossible for the Court to redress the plaintiffs' injuries with an injunction against the District. *See* Dist. Mot. to Dismiss 12–14. The BOP, also citing the *Brown* court, mirrors the District's argument by stating that because the IDEA does not apply to federal agencies, the plaintiffs also do not have a claim against them.

To the extent the statutory conflict does create a division of *custodial* responsibility on the one hand and responsibility for *provision of education services* on the other, the defendants' redress is with Congress, not this Court. As the *Brown II* court observed, neither the plain language nor the legislative history of the Revitalization Act "suggests that Congress intended to transfer the District's IDEA obligation" to the BOP. *Brown II*, 324 F. Supp. 2d at 161. The BOP is not off the hook either. While the BOP has no obligation to the plaintiffs under the IDEA, it does have obligations to them under the Constitution. And the plaintiffs have pleaded facts sufficient to convince this Court that the BOP may be violating their right to due process under the Fifth Amendment.

As noted above, not all the plaintiffs' claims survive the defendants' motions to dismiss. Instead, the claims that the Court will allow to proceed beyond the motion to dismiss stage are: (1) the claim in Count I that the District has failed to provide a FAPE to students in BOP custody in violation of the IDEA, 20 U.S.C. § 1412(a)(1)(A); and (2) the Claim in Count II that the the BOP's practice of categorically denying the plaintiffs *access* to a FAPE without a pre-deprivation hearing violates the Due Process Clause of the Fifth Amendment.

## V.    CLASS CERTIFICATION

The plaintiffs seek to certify a class consisting of all residents of the District of Columbia between the ages of eighteen and twenty-four who either: (1) are incarcerated in BOP facilities pursuant to the Revitalization Act and are entitled to receive special education and/or related services pursuant to the IDEA; (2) are or were incarcerated in the BOP as D.C. Code offenders and were entitled to receive special education and/or related services pursuant to the IDEA and its federal and local implementing regulations and District law, but have since aged out of eligibility; or (3) will be incarcerated in the BOP as D.C. Code offenders and are entitled to receive special

education and/or related services pursuant to the IDEA and its federal and local implementing regulations and District law, and do not, did not, or will not, receive special education and/or related services. Mot. for Class Cert. 1.

The Court finds that the four conditions of Rule 23(a)—adequacy, numerosity, commonality, and typicality—have all been met in this case. Additionally, the two claims on which the Court is allowing the case to proceed—the claim against the District for not providing a FAPE and the claim against the BOP for denying access to a FAPE—can both be maintained under Rule 23(b)(2). Accordingly, the Court will **GRANT** the plaintiffs' Motion to Certify the Class and issue an order defining "the class and the class claims" and appointing counsel under Rule 21(g). Fed. R. Civ. P. 23(c)(1)(B).

### A.    Adequacy of Representative Parties and Class Counsel

#### 1.    Adequacy of the Representative Plaintiffs

The first condition that the Court will address is that the representative plaintiffs show they will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To satisfy adequacy, the representative plaintiffs (1) "must not have antagonistic or conflicting interests with the unnamed members of the class," and (2) "must appear able to vigorously prosecute the interests of the class through qualified counsel." *J.D.*, 925 F.3d at 1312.

The representative plaintiffs have shown that they are adequate representatives of the class. As they note in their Motion, they already attempted to bring claims on behalf of the putative class before the hearing officer. Mot. for Class Cert. 20. And their counsel asserts that they both "understand the responsibilities of being the named litigants and class representatives in this matter and have consented to such on behalf of the class." *Id.* In the absence of any evidence or argument

from the defendants to the contrary, the Court finds these representations sufficient to show that the representative parties will fairly and adequately protect the interest of the class.

The BOP does not raise any arguments as to adequacy, and the District simply argues that the plaintiffs do not satisfy the first prong insofar as they "have *no interest at all*" in the litigation. Dist. Opp'n 10. But this is simply a rehashing of the District's arguments about standing and mootness in its Motion to Dismiss, which the Court has rejected. The plaintiffs have pleaded facts sufficient to state a claim and have survived the defendants' motions to dismiss. They indisputably have an ongoing interest in the outcome of this litigation.

### 2.    Adequacy of Class Counsel

Rule 21(g) states that "a court that certifies a class must appoint class counsel." In making such an appointment, the certifying court must examine:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and
> (iv) the resources that counsel will commit to representing the class[.]

Fed. R. Civ. P. 21(g)(1)(A). The School Justice Project, Washington Lawyers' Committee for Civil Rights and Urban Affairs, and Nixon Peabody LLP (collectively "Plaintiffs' Counsel") have collectively applied for appointment, but Rule 23(g)(2) states that when "more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class." *Id.* 21(g)(2).

All of Plaintiffs' Counsel have submitted evidence pertinent to the four considerations under Rule 21(g)(1)(A). First, all three Plaintiffs' Counsel have invested heavily in identifying and investigating potential claims in the instant case. Mot. for Class Cert. 21. They began researching the claims in 2022, and they have filed two administrative due process complaints on

behalf of the representative plaintiffs, litigating those claims through to resolution. *Id.* They collectively filed the Complaint, Motion to Certify the Class and subsequent Replies, and detailed, thorough Responses to both the District's and BOP's motions to dismiss. Plaintiffs' Counsel have also submitted declarations both as to their experience handling class actions and their knowledge of the substantive law, including the IDEA. *Id.* at 21–22. Finally, Plaintiffs' Counsel have committed to "allocating the financial resources necessary to pursue this litigation through its completion." *Id.* at 22–23.

While these declarations come from attorneys employed by each of the Plaintiff's Counsel organizations, the School Justice Project was counsel for plaintiffs in the *Brown* litigation cited approvingly by the hearing officer. *Id.* at 22. Given this experience, the Court is of the opinion that the School Justice Project is the best applicant to sustain this action on behalf of all plaintiffs. Neither defendant objects to the qualifications listed by Plaintiffs' Counsel, and the Court will therefore appoint the School Justice Project as class counsel for the representative plaintiffs.

### B.    Numerosity

Rule 23(a)(1) calls for classes to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The parties dispute what burden the plaintiffs must meet in demonstrating numerosity. The plaintiffs claim that they simply must provide a reasonable basis for estimates of numerosity that are made in "good faith." Mot. for Class Cert. 3 (citing WILLIAM B. RUBENSTEIN, NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 3.3 (6th ed. 2022)). The District, however, argues that the plaintiffs must demonstrate numerosity by a preponderance of the evidence. Dist. Opp'n 12 (citing *Hoyte v. Dist. of Columbia*, 325 F.R.D. 485, 491 (D.D.C. 2017)). While the Court has expressed its opinion that the applicable standard is preponderance, *Lewis*, 743 F. Supp. 3d at 194, it ultimately does not matter because the plaintiffs have

demonstrated numerosity under either a preponderance of the evidence or a reasonable basis standard.

Plaintiffs make two arguments to show that they demonstrated numerosity. First, they cite statistics showing that the class can reasonably be calculated to contain between forty and sixty members. Mot. for Class Cert. 8–10. Second, they claim that there are sufficient "non-numerical considerations" to make joinder of all class members impracticable. *Id.* 11–13. The Court will address each of these in turn.

The plaintiffs cite three government sources or sets of sources that support their estimate of forty to sixty class members. The first set of government sources are Info Sheets from the District's Corrections Information Council (CIC). These Info Sheets show that: (1) as of January 2023, there were 155 District residents under age twenty-five in BOP custody; (2) as of October 2023, there were 96 District residents under age twenty-three in BOP custody; and (3) as of April 1, 2024 (the date of the filing of the operative Complaint), there were 183 District residents under age twenty-five in BOP custody. Pl.'s Mot. 9–10. The plaintiffs' second source, a report from the Bureau of Justice statistics, shows that 24% of people incarcerated in BOP facilities received special education classes before their incarceration. *Id.* at 10. Taken together, the plaintiffs say, these two studies show that there is a reasonable basis for concluding that at least forty individuals fall within the definition of the proposed class. The plaintiffs also cite testimony provided by the District's Department of Corrections ("DOC Testimony") from April 7, 2024, when the DOC reported to the D.C. Council that seventy-seven students were enrolled in the DOC's high school, which "exclusively serves students with special education needs." *Id.* While the plaintiffs concede that not all seventy-seven of those individuals will ultimately be incarcerated in a BOP facility and therefore qualify as class members, they claim that this report bolsters their numerosity claims.

Second, the plaintiffs claim that regardless of the actual number of total claimants, the class should be certified because "joinder is impracticable" for four non-numerical reasons. Mot. for Class Cert. 11. They note that "classes including future claimants generally meet the numerosity requirement due to the impracticability of counting such class members." *Id.* (citing *J.D.*, 925 F.3d at 1323). They further argue that joinder is impracticable because class members are dispersed across the country in various BOP facilities. *Id.* at 11–12. The third and fourth non-numerical considerations the plaintiffs urge this Court to consider are the youth and likely indigency, of the putative class members. *Id.* at 12–13.

The opposition briefs filed by the District and BOP mainly challenge the sufficiency of the studies cited by the plaintiffs. *See generally* Dist. Opp'n 11–13; BOP Opp'n 6–11. The District first attacks the sufficiency of the evidence in the reports. Dist. Opp'n 12. They also argue that individuals self-reporting that they received special education before incarceration does not equate to a showing that they are eligible for an IEP under the IDEA. *Id.* Furthermore, they state that the plaintiffs "offer no information at all" about which of the seventy-seven individuals currently in DOC are within the age group of the class and will certainly be transferred to BOP.

The BOP largely echoes these arguments. BOP Opp'n 8–9. They also add that the January 2023 and April 2024 Info Sheets capture data from students who are in BOP custody and are twenty-five years old, which is outside the age range of the proposed class. *Id.* at 9. And they label the Bureau of Justice statistics report as "far too stale to allow the court to draw the reasonable inference that the data is accurate for purposes of the class." *Id.* Turning to the DOC Testimony, the BOP argues that the number of people at the DOC facility is not equal to the number of people who will ultimately be committed to BOP custody as D.C. Offenders. *Id.* at 10. Therefore, the

44

BOP claims, any estimate of the class membership that relies on these statistics would be "entirely speculative." *Id.*

The plaintiffs acknowledge that the data provided by the CIC Info Sheets is likely "overinclusive." Pl.'s Repl. to BOP 7. But even taking that into consideration, the Court finds that the preponderance of the evidence shows that there are at least forty individuals who would qualify for class membership. Take, for example, the most recent Info Sheet cited by the plaintiffs. It demonstrates that there are 183 District residents currently in BOP facilities under the age of twenty-five. If those 183 are evenly distributed by age, then there are approximately twenty-three individuals at each age from eighteen to twenty-five.[17] And that means there are approximately 114 students between the ages of eighteen and twenty-two.[18] According to the Bureau of Justice statistics information, somewhere between 24% and 34% of those students is eligible for special education under the IDEA. This means that between twenty-seven and thirty-nine of the individuals who are currently in BOP custody qualify for class membership.

The DOC Testimony provides evidence that there are even more individuals who qualify for class membership under the third prong of the proposed class definition. There are seventy-seven individuals who are currently at the DOC high school. Pl.'s Mot. 10. If the Court applied the same range of percentages—24% and 34%—to the group, it would result in a range of qualified class members from eighteen to twenty-six students.[19] Therefore, the statistics provided by the plaintiffs suggest that there are between forty-five and sixty-five individuals who would qualify as class members.

---

[17] 183 divided by the eight ages.

[18] 23 times 5.

[19] It is likely that  though the proportion of these individuals who are eligible for special education under IDEA is likely higher than the average incarcerated population.

Against the weight of these statistics, the District and the BOP do not put forth any evidence of their own to rebut the plaintiffs' evidence, opting instead to poke holes in the statistics proffered by the plaintiffs. Even under their proposed preponderance of the evidence standard, the defendants lose. *See Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 622 (1993) (holding that the preponderance standard "simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence") (internal quotation marks omitted). The statistics put forth by the plaintiffs demonstrate that it is more probable than not that the class size is sufficiently numerous. The defendants have put forth no evidence to the contrary, so not only the preponderance but indeed *all* of the evidence submitted lends itself to this conclusion. Especially considering that the reports cited by the plaintiffs were created by the defendants, the defendants presumably could have offered some evidence to rebut the plaintiffs' numerosity statistics. The defendants' silence on this point is deafening.

The plaintiffs' case is bolstered by the compelling non-numerical considerations at play in this case. At bottom, the plaintiffs ask this Court to enjoin certain "policies and practices" of the District and BOP. Such an injunction contemplates future class members, making smaller class sizes at the certification stage more acceptable to the Court. *J.D.*, 925 F.3d at 1322 (citing *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975)). Additionally, the Court agrees that the "transitory nature of a detention facility" makes joinder of these future plaintiffs impracticable. *Charles H. v. Dist. of Columbia*, No. 21-cv-997-CJN, 2021 WL 2946127, at *13 (D.D.C. June 16, 2021).

Notably, the BOP's opposition does not even mention the non-numerical considerations.[20] And the District only devotes one paragraph to refuting their importance. Dist. Opp'n 13. The District argues that non-numerical factors cannot absolve the Court of its responsibility to conduct a numerical analysis. *Id.* (citing *Hinton v. Dist. of Columbia*, 567 F. Supp. 3d 30, 55 (D.D.C. 2021)). Even if the Court were bound by this statement of a sister court, the Court has not avoided analyzing the numerical evidence offered by the statistics. Rather, the non-numerical factors bolster a conclusion that numerosity is met here, and the Court finds that the plaintiffs have shown by a preponderance of the evidence that their class is so numerous that joinder of all members is impracticable.

### C.    Commonality and Typicality

"The commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co.*, 457 U.S. at 157–58, n.13. Plaintiffs must show that there are "questions of law or fact common to the class" to establish commonality. Fed. R. Civ. P. 23(a)(2). The Supreme Court has instructed that it "is not the raising of common 'questions' . . . but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation" that drives the commonality inquiry. *Wal-Mart*, 564 U.S. at 350. Representative plaintiffs' claims must also be "typical of the claims or defenses of the class" to satisfy typicality. Fed. R. Civ. P. 23(a)(3). The representative plaintiffs may demonstrate typicality by showing that their claims and the other members' claims "stem from a single event or a unitary course of conduct, or . . . are based on the same legal or remedial theory." *J.D.*, 925 F.3d at 1322. The Court will start with the

---

[20] Indeed, much of the case law cited by the BOP supports this Court's reliance on non-numerical sources. *See NS v. Hughes*, 335 F.R.D. 337, 352 (D.D.C. 2020) (holding that, in determining whether joinder is practical, courts should consider "financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members"); *Coleman ex rel. Bunn v. Dist. of Columbia*, 306 F.R.D. 68, 76 (D.D.C. 2015) ("[A] class that encompasses fewer than 20 members will likely not be certified absent other indications of impracticability of joinder.") (quoting Newberg on Class Actions, § 3:11 (5th ed. 2014)).

plaintiffs' asserted common questions of fact, proceed to their common questions of law, and then analyze whether their claims are "typical" of the class.

### 1.    There Are Common Questions of Fact

The representative plaintiffs set forth a list of common facts that they share with all members of the putative class. Specifically, they state that the class is comprised of residents of the District, each between eighteen and twenty-four years of age, who: is, was, or will be incarcerated as a D.C. Offender; who is or was eligible for special education and has, or had, an IEP pursuant to the IDEA; who does not, has not, or will not receive an IDEA-compliant education while in BOP custody; and who has been or will be deprived of special education instructions and services while in a BOP facility. Mot. for Class Cert. 15–16. Because of this common set of facts, the plaintiffs say, they and the putative class members have "been treated the same way through the same policies and practices" of the District and BOP. *Id.* at 16.

In addition to answering these common questions for all putative class members, class certification would provide an answer to two more fundamental questions: (1) is the District pursuing a policy of blanket denials of a FAPE for D.C. Offenders; and (2) is the BOP categorically denying District employees and contractors access to its facilities, thereby barring plaintiffs from accessing the FAPE to which they are entitled, without due process? At the administrative hearing, "the BOP's education administrator refused to answer any specific questions about the offender's access to diploma programs and special education services." Barnes HOD 8–9; McNeal HOD 8. Meanwhile, both plaintiffs submitted their respective HODs, which contained a letter from the BOP indicating it would both prevent outside contractors from entering its facilities and refuse to relocate the plaintiffs to a facility where they could receive IDEA-compliant education. *Id.* at 8. Indeed, the BOP went so far as to tell the District in another letter that "the BOP alone is

48

responsible for educating offenders in its custody and that the BOP has its own programs to provide education services." *Id.* at 10. Discovery will allow the parties to gather information as to whether these actions by the BOP are part of a broader policy of denying a FAPE to any D.C. Offenders in their custody.

The defendants do not deny that class certification will answer these common factual questions. Most importantly, records from the District and BOP will conclusively identify all current members of the class, while those records will also be invaluable in identifying future claimants as they join the class. Furthermore, the plaintiffs are undoubtedly challenging "policies" and "practices" of both the District and the BOP that have harmed them. Because the putative class members are located at BOP facilities all across the country, class certification will allow the Court to comprehensively review whether, across these disparate facilities, the challenged District and BOP policies are uniform in their systematic denial of FAPE. It is clear to the Court that a classwide challenge will thus "generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350.

### 2.    There Are Common Questions of Law

The plaintiffs have listed a set of common questions of law that they believe establish commonality. As to the District, the plaintiffs argue that classwide litigation will answer: (1) whether the members of the putative class are entitled to special education and related services under the IDEA; (2); whether the District is responsible for providing a FAPE to class members; (3) whether the District has failed to provide a FAPE to class members; and, if so, (4) whether the members are entitled to compensatory education under the IDEA. Mot. for Class Cert. 15. As to the BOP, the plaintiffs assert that there is one common question of law: whether "the BOP's policies and practices barring class members from accessing the special education instruction and

services to which they are entitled under the IDEA" violates the Due Process Clause of the Fifth Amendment. *Id.*

      *a.    Class Certification Will Answer Whether the District Has Denied Plaintiffs a FAPE in Violation of § 1412(a)(1)(A)*

The District argues that because the Complaint alleges violations of four separate sections of the IDEA, there necessarily will be different questions of law for each alleged violation. Because each of the statutory provisions "raises different factual and legal issues," the District believes class certification is barred. Dist. Opp'n 15. The Court has already addressed the District's argument that different questions of law will arise from the alleged violation of four different provisions of the IDEA. Class certification will be able to provide a "common answer" to the question of whether the District has denied the putative class members a FAPE in violation of § 1412(a)(1)(A), so the District's argument fails.

      *b.    Class Certification Will Answer Whether The District or BOP Has a Uniform Policy of Denying a FAPE, or Access to a FAPE, to D.C. Offenders*

Next, the District and BOP both argue that even if this Court finds that the District has violated the IDEA as to each of the plaintiffs, that is "not enough to establish Rule 23(a) commonality . . . in the absence of a uniform policy or practice that affects all members." *Id.*; *see also* BOP Opp'n 11 (each citing *DL v Dist. of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013)). The BOP further states that the plaintiffs "have not offered 'significant proof' that the Bureau has a 'general policy' of failing to implement special education services." *Id.* at 14 (citing *Wal-Mart*, 564 U.S. at 353, 355). They state that the questions raised by the plaintiffs' Complaint will vary based on the conditions of detention faced by each plaintiff, the specific services they are entitled to under the IDEA, and how the BOP's policies have led to a violation of due process. *Id.*

50

This is a case where "proof of commonality necessarily overlaps" with the plaintiffs' merits argument. *Wal-Mart*, 564 U.S. at 352. The plaintiffs are incarcerated at two separate facilities, and the BOP has offered the Court no reason to think their practice of preventing external education providers from accessing inmates is facility-specific. Regardless of the underlying conditions of detention or specific services to which the putative class members are entitled, there is a common question of whether the BOP is pursuing a policy of blanket denial of access to a FAPE.

As discussed above, this type of categorical preclusion is clearly a common question of fact, and whether the preclusion is a violation of due process is just as clearly a common question of law that can be answered as to the entire putative class. *Cf. DL v. Dist. of Columbia*, 713 F.3d 120, 131 (D.C. Cir. 2013) (Edwards, J., concurring) ("If the District of Columbia has adopted a 'stopped at the door' policy or practice that effectively blocks disabled children from . . . being considered for IDEA benefits, then the affected children in appropriate classes or subclasses may challenge the policy or practice in a class action.").

    *c.*    *The BOP's Substantive Due Process Argument Is Inapposite*

The BOP next argues that even if the plaintiffs could point to a BOP policy or practice that denies access to a FAPE, the plaintiffs must further show that the policy amounts to a "punishment" that violates due process. BOP Opp'n 14. To make that determination, says the BOP, the Court must assess whether the government's action is rationally related to a legitimate government purpose—an inquiry which is, according to the BOP, "not susceptible to a common classwide answer," precluding class certification. The BOP cites dicta from *Kingsley v. Henrickson*, a Supreme Court case in which the plaintiff was an incarcerated inmate challenging certain prison policies. 576 U.S. 389 (2015). The BOP's argument misses the mark, widely, by framing their denial of plaintiffs' access to a FAPE as a punishment in violation of the plaintiffs'

*substantive* due process rights. *Id.* at 407 (Scalia, J., dissenting) ("Kingsley seeks relief . . . under the doctrine of 'substantive due process.'"). The plaintiffs here do not claim they are being punished by BOP practices, so the BOP's reliance on *Kingsley* is totally misplaced. Nor do the plaintiffs argue that they have a fundamental liberty interest in a FAPE. In fact, they concede that they do not. Pl.'s Opp'n to BOP 22. Instead, the plaintiffs seek relief for a denial of a *protected property interest* without notice and hearing to which they were entitled under procedural due process.[21]

### 3.    The Representative Plaintiffs Claims are Typical of the Proposed Class

Finally, the representative plaintiffs argue that their claims are typical of the putative class members. Although most of the typicality objections raised by the defendants were intertwined with their objections to commonality, the District raises an independent typicality argument that merits attention. The District notes that the representative plaintiffs alone, among all members of the putative class, have demonstrated that they have completed the administrative review process prescribed by the IDEA and received an HOD. Dist. Opp'n 9. This is important because the IDEA only allows suits in district court for plaintiffs who have been "aggrieved" by an HOD decision, so the District argues that the representative plaintiffs' claims are atypical. 20 U.S.C.

---

[21] Worse yet for the BOP's position is that they do not even cite a legitimate interest that would justify denying the plaintiffs access to a FAPE under a rational basis theory. Instead, the BOP brazenly asserts that it has "legitimate government interests" against which a plaintiff's denial of a FAPE must be weighed under the rational basis test. BOP Opp'n 15. But the BOP's bare assertion of legitimate interests, without even an attempt at explaining what those are, exposes the weakness of the BOP's argument. The BOP further suggests that weighing denial of access to a FAPE against these legitimate interests "turns on each putative class member's specialized education requirements and questions regarding eligibility with respect to conditions of confinement." *Id.* at 15. This is an attempt to recast the putative class's interest in a common answer about the BOP's denial of a FAPE access into an individualized question in order to undermine commonality. But a brief review of the representative plaintiffs' own circumstances destroys any credibility this argument may have. Housed at two different BOP facilities, Plaintiffs Barnes and McNeal were both categorically denied a FAPE and told that even if they were to challenge this denial under the ARP, they could, at best, receive access to the BOP's literacy and GED programs.

§ 1415(g)(1).[22]    But this argument raises a concern about the entitlement to compensatory education, not a concern about the two claims that are moving beyond the motions to dismiss. While it is true that the other members of the putative class will not be entitled to compensatory education without an HOD, the claims going forward in this class action are not claims for compensatory education but instead claims seeking extended eligibility to complete any potential compensatory education and cessation of the BOP's policy of categorically denying plaintiffs access to a FAPE. The harms that would be redressed by that relief are typical of the class.

### D.    Hybrid Certification

Even if a class satisfies the requirements of Rule 23(a), it may be maintained only if it satisfies one of the three provisions of Rule 23(b). Because the plaintiffs are seeking both injunctive and declaratory relief and compensatory education, they seek "hybrid certification" under Rules 23(b)(2) and (b)(3). Rule 23(b)(3) concerns class certification of "individualized monetary claims." *Wal-Mart*, 564 U.S. at 362. And while compensatory education awards are sometimes considered equitable relief, *e.g.*, *Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 523 (D.D.C. 2005), in cases seeking both compensatory education awards and injunctive and declaratory relief, courts have approved a hybrid certification under both Rules 23(b)(2) and (b)(3). *See A.R. v. Conn. State Bd. of Educ.*, 5 F.4th 155, 159 (2d Cir. 2021); *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481 (7th Cir. 2012). However, because the Court is granting the defendants' motion

---

[22] The District first re-raises its argument that the plaintiffs lack standing because their award of compensatory education means they were not "aggrieved" by the HOD. Dist. Opp'n 8. They sardonically agree that the plaintiffs' interests don't "conflict" with the putative class members in a way that would destroy typicality because the representative plaintiffs' "only continuing interest in this case seems to be a desire to vindicate the rights of others." *Id.* But the Court has already rejected this standing argument. To the extent the District believes that their claims are now moot because the plaintiffs have aged out, the Court has also explicitly rejected this argument, holding that IDEA claims are "inherently transitory." Because inherently transitory claims become moot prior to certification, "a motion for certification may 'relate back' to the filing of the complaint." *J.D.*, 925 F.3d at 1308 (citing *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 & n.2 (2013)).

to dismiss with regard to the plaintiffs' claims for compensatory education, there is no need to address the (b)(3) claims. Therefore, the Court will only consider certification under Rule 23(b)(2).

### 1.    Rule 23(b)(2)

To satisfy Rule 23(b)(2), a plaintiff must show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2). Such a showing must assure the Court that any issuance of "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Id.* The Rule is often broken down into two elements: "(1) the party opposing the class must have 'acted or refused to act on grounds that apply generally to the class,' and (2) 'final relief of an injunctive nature . . . must be appropriate.'" *Charles H.*, 2021 WL 2946127, at *14.

The Court has reiterated throughout this Opinion that the representative plaintiffs' claims directly attack actions by the District and BOP that affect the entire proposed class. The District has allegedly failed to offer a FAPE to any student currently incarcerated in a BOP facility. Of course, this failure may be due in part or in whole to the BOP's refusal to provide the plaintiffs access to a FAPE by denying the District and its educational partners physical access to the plaintiffs. Enjoining these actions, or failures to act, would be appropriate as to the entire class. The plaintiffs have therefore met both elements and are therefore entitled to certification under Rule 23(b)(2).

The District seeks to avoid this conclusion by challenging the plaintiffs' requested injunction against them as "too broad" and therefore in violation of the instruction in Rule 65(d) that injunctions "describe in reasonable detail . . . the act or acts restrained or required." Dist. Opp'n 23 (citing Fed. R. Civ. P. 65(d)). But the Court is not entering an injunction at this time,

and the final injunction might be far narrower than the one the plaintiffs have asked for. Indeed, this Court has already dismissed some of the claims brought by the plaintiffs. But it is clear that the Court may "grant such relief as the court determines is appropriate" for violations of the IDEA. 20 U.S.C. § 1415(i)(2)(C)(iii). This could include, among other things, extending the eligibility of class members who have been denied a FAPE while in BOP custody as a means to "undo the FAPE denial's affirmative harm . . . [and] compensate for lost progress that the student would have made." *B.D.*, 817 F.3d at 798.

The BOP's Opposition to certification under Rule 23(b)(2) recycles many of the arguments it raised in its Motion to Dismiss. BOP Opp'n 18 ("[A]s noted in Defendants' motion to dismiss, [the plaintiffs'] argument fails for a few reasons."); *see also id.* at 19 (recycling arguments about exhaustion of remedies and offering the BOP's literacy program as an alternative to a FAPE). The thrust of the BOP's new arguments is that because the plaintiffs seek "process itself," any remedy provided by this Court would involve "coordination between the [BOP] and the incarcerated individual" to determine what process the individual would be due. *Id.* at 18. And this individual determination, they argue, would go against Rule 23(b)(2)'s instruction that "a single injunction . . . provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360. Furthermore, fashioning such an injunction would, says the BOP, force either the BOP or the Court to determine what specific education and related services each individual plaintiff would receive. *Id.* at 21.

The BOP's framing of what action the Court might enjoin is telling. It objects to any order to "provide" special education to the plaintiffs. BOP Opp'n 19 (arguing that any grant of additional process to the plaintiffs "would be individualized" insofar as it would involve a determination of "what (if anything) could be *provided* by the [BOP], how it would be *provided*, and an

individualized analysis of whether the [BOP's] literacy program *addresses* the individuals' education needs") (emphasis added). But an injunction from the Court of the kind proposed by plaintiffs would not force either the BOP or the Court to proactively conduct any individualized assessment. This is because the District has a mandate to make a FAPE available to learning-disabled students under the IDEA and accompanying body of federal and local implementing regulations. *See* 20 U.S.C. § 1400; 34 C.F.R. § 300; 5 D.C.M.R. § 3000. And as discussed *supra*, the District has established protocols for making the individualized determination of which the BOP complains with over 100 pages of regulations. Thus, a statutory process for individualized determination already exists. The problem is that the BOP has prevented tutors from entering its facilities to reach students, refused to cooperate with the District to determine if a single facility could accommodate all IDEA-eligible students, claimed sole responsibility for the plaintiffs' education at the exclusion of all others, and obstructed the plaintiffs' access to a FAPE in myriad other ways. *E.g.*, Barnes HOD 8–10. The plaintiffs do not want the BOP to make an individualized determination about what process they are due. Quite frankly, the plaintiffs just want the BOP to get out of the District's way.

The BOP also objects that enjoining them from preventing plaintiffs' access to a FAPE would not constitute "final relief." BOP Opp'n 21. Relying on dicta from a Seventh Circuit opinion, the BOP argues that the injunction sought by the plaintiffs would "merely initiate a process through which highly individualized determinations of liability and remedy are made." *Id.* at 21–22 (citing *Jamie S.*, 668 F.3d at 499). Because some class members will "inevitably disagree that the specialized education" they receive through an HOD will comply with their IEPs, the BOP argues, an injunction against the BOP's current policy of preventing access to a FAPE would not be final. But this argument is backwards. The BOP is essentially saying that because its policy

imposes an insurmountable barrier to the *process* from which final relief can be granted, removing that barrier would not guarantee that the plaintiffs would be awarded relief after availing themselves of the process.

The BOP attempts to compare the relief sought here with the relief granted by the district court in *Jamie S.*, a Seventh Circuit case dealing with a class of students who were denied or delayed entry into the IEP process by their LEA. 668 F.3d at 485. The class members alleged that the LEA had failed to identify eligible students (under the so-called child-find provision of the statute) and subsequently failed to hold the statutorily required IEP meeting with the students and their parents. *Id.* at 486. The statute establishes an "IEP Team," which is responsible for creating the child's IEP and monitoring their progress. *Id.* (citing 20 U.S.C. § 1414(d)(1)(B)). The district court found the LEA and SEA failed to identify IDEA-eligible children and conduct an IEP meeting, resulting in "'systemic' violations of the child-find requirements." *Id.* at 488.

As a remedy for this failure, the district court *sua sponte* established a "hybrid IEP team," which closely resembled the statutorily authorized IEP team but included "a court-appointed monitor to oversee its operation." *Id.* at 489. The Seventh Circuit struck down this remedial scheme, in part because it "require[d] thousands of individual determinations of class membership, liability, and appropriate remedies." *Id.* at 499. The problem the Seventh Circuit had with the injunction sought by plaintiffs in that case was that it required a *court-created* and *court-monitored* remedial scheme, which supplanted the structure created by Congress for one overseen and monitored by the Court. Thus, in decrying the district court's injunction as "merely initiat[ing] a process," the Circuit's disapproval was aimed at the fact that the process was driven by the court. *Id.*

57

Here, the plaintiffs are asking the Court to do the opposite. Rather than establish a complicated remedial scheme that either the BOP or the Court will have to monitor, the plaintiffs want the Court to order the BOP to take its hands *off* so that the statutory process for providing a FAPE and remedying denials of it may proceed as Congress intended. Such an order, if granted, would provide the plaintiffs final relief *as to the BOP* because it would allow them to access a FAPE and remedy any denials within the mechanisms created by the IDEA and accompanying District regulations. Instead of initiating a process, then, the order would simply unleash a process that already exists.

## VI.    CONCLUSION

Upon their placement in BOP custody, the plaintiffs allege that they stopped receiving the special education to which they were entitled. Both representative plaintiffs were, based on the facts presented in their pleadings, far along the road toward a high school degree. With more than three years of eligibility left under the IDEA, it is entirely possible that they would have completed their coursework and received their degrees but for their incarceration in BOP facilities. Their incarceration should not have ended forever their opportunity to achieve a high school degree. After all, the entire point of the IDEA is to help students with disabilities by "meet[ing] their unique needs and prepar[ing] them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

Underlying the arguments in both the District's and BOP's motions to dismiss is a sophisticated game of finger-pointing. The Court readily acknowledges that the IDEA and Revitalization Act, taken in conjunction with each other, force these two governmental agencies to work together to ensure the purposes of the IDEA are met. If one of the defendants is refusing to fulfil its obligations to the plaintiffs under the Constitution and the IDEA, though, it is not an

excuse for the other one to throw up its hands at the expense of the plaintiffs and others who are similarly situated.

At this stage in the litigation, it is at least "plausible" that the District and BOP violated the plaintiffs' rights by failing to provide a FAPE in violation of § 1412(a)(1)(A) of the IDEA and by denying access to a FAPE without notice or an opportunity to be heard in violation of the Due Process Clause of the Fifth Amendment. The Motions [ECF Nos. 30, 31] to Dismiss will therefore be **DENIED** as to those two claims but **GRANTED** as to all other claims. A separate Order consistent with this Memorandum Opinion shall issue.

Furthermore, the Plaintiffs' Motion [ECF No. 22] to Certify a Class will be **GRANTED** on those two claims alone. In accordance with Federal Rule of Civil Procedure 23(c)(1)(B), a separate Order shall issue defining the class and the claims in a manner consistent with this Opinion.

Date: 2 8 March, 2025

Royce C. Lamberth
United States District Judge